**IN THE UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

———————————————————————————————

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**as Receiver for ATLANTIC BANK & TRUST,**

      **Plaintiff,**

**vs.**                                   **Civil Action No.:** 2:14-cv-02101-DCN

**MARK J. BARONE, BRENT A. CASE,**
**JOHN T. CHAKERIS, HAL E. COBB,**
**CHARLES T. COLE, MARGARET L. HINES,**
**and DARRELL L. OWENBY,**

      **Defendants.**

———————————————————————————————

## COMPLAINT

———————————————————————————————

      The Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for

Atlantic Bank & Trust, Charleston, South Carolina ("FDIC-R"), files its complaint against Mark

J. Barone, Brent A. Case, John T. Chakeris, Hal E. Cobb, Charles T. Cole, Margaret L. Hines,

and Darrell L. Owenby, and states:

## I. INTRODUCTION

      1.     The FDIC-R seeks to recover tort damages resulting from the negligence, gross

negligence, and breaches of fiduciary duties of seven former directors and officers of Atlantic

Bank & Trust ("Atlantic" or "the Bank") - Mark J. Barone, Brent A. Case, John T. Chakeris, Hal

E. Cobb, Charles T. Cole, Margaret L. Hines, and Darrell L. Owenby (collectively,

"Defendants").

      2.     Defendants breached their fiduciary duties and were negligent and grossly

negligent by, among other things, recommending and/or approving at least 22 transactions that

were funded by Atlantic between June 2008 and April 2009 ("Subject Transactions"). The Subject Transactions violated the Bank's Loan Policy as well as prudent underwriting and lending practices. In connection with the Subject Transactions, Defendants agreed to lend more than $18.5 million to borrowers without, among other things, adequately analyzing the creditworthiness of the borrowers and guarantors, without establishing that the borrowers' proposed real estate projects were feasible or likely to result in repayment, without establishing proper and/or adequate terms of repayment, without identifying any reasonably reliable and adequate sources of repayment, and without adhering to prudent underwriting standards.

3.      The Defendants' negligence, gross negligence, and breaches of fiduciary duty caused substantial damages of $9.263 million or an amount to be proven at trial. Defendants are jointly and severally liable for the damages they caused in violating the Bank's policies and prudent banking practices. In this lawsuit, the FDIC-R does not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from the Defendants' negligence, gross negligence and breaches of fiduciary duty.

## II. **PARTIES**

**A.      Plaintiff**

4.      The FDIC is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. §§ 1811-1835a. The FDIC is an instrumentality of the United States of America and is charged with, among other duties, the orderly liquidation of failed banks. 12 U.S.C. § 1821(c)(2)(A)(ii). Atlantic was a federally chartered stock savings bank, and its deposits were insured by the FDIC.

5.      On or about June 3, 2011, the Office of Thrift Supervision ("OTS") closed Atlantic and named the FDIC as Receiver ("FDIC-R"). Pursuant to 12 U.S.C. §1821(d)(2)(A)(i),

the FDIC-R succeeded to all the rights, titles, and privileges of Atlantic and, among others, its depositors, account holders, other creditors and stockholders.

**B.**     **Defendants**

6.     Mark J. Barone ("Barone") was Chief Credit Officer ("CCO") and a member of the Executive Management Committee ("EMC")/Executive Loan Committee ("ELC") from February 2007 to September 2010.  Barone resides in Winston Salem, North Carolina.

7.     Brent A. Case ("Case") was a director and member of the Board Loan Committee ("BLC") from February 2007 until August 2010.  Case resides in Charleston, South Carolina.

8.     John T. Chakeris ("Chakeris") was a director and member of the BLC from February 2007 until August 2010.  Chakeris resides in Charleston, South Carolina.

9.     Hal E. Cobb ("Cobb") was President, Chief Executive Officer ("CEO"), member of the EMC/ELC, and served as a director from February 2007 through October 2008.  Cobb resides in Folly Beach, South Carolina.

10.     Charles T. Cole ("Cole") was a director and member of the BLC from February 2007 until August 2010.  Cole resides in Sullivans Island, South Carolina.

11.     Margaret L. Hines ("Hines") was President from October 2008 to April 2009, director and Chairman of the BLC from February 2007 to July 2009.  Hines resides in Mt. Pleasant, South Carolina.

12.     Darrell L. Owenby ("Owenby") was a director and member of the BLC from February 2007 until August 2010.  Cole resides in Mt. Pleasant, South Carolina.

### III. JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this matter pursuant to 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

14.     The Court has personal jurisdiction over the Defendants who at all relevant times conducted business in the State of South Carolina.

15.     Venue is proper in this District under 28 U.S.C. §1319(b), as all or substantially all of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## IV. FACTUAL BACKGROUND

### A.     History of the Bank

16.     Atlantic was chartered on October 30, 2006, and began operations on February 20, 2007 in Charleston, South Carolina.  By June 2011, Atlantic also had full service branch offices in Myrtle Beach, South Carolina, and Savannah, Georgia, and an operations center in North Charleston, South Carolina.

17.     Atlantic was wholly owned by Atlantic Banc Holdings, Inc., a bank holding company based in Charleston, South Carolina.

18.     From its inception, Atlantic's Board and management team implemented an aggressive growth strategy driven by increases in high-risk Commercial Real Estate ("CRE"), raw land, and land development loans.  As officers and/or directors, all of the Defendants were instrumental in the implementation and pursuit of this aggressive growth strategy.

19.     The Bank was subject to the supervision of the OTS, and examiners from the OTS conducted regular examinations.  Before any of the Subject Transactions were funded, examiners reported to Atlantic's Board that the Bank's growth strategy resulted in high concentrations of high-risk CRE, land, and land development loans.  The examiners also noted deficiencies in loan underwriting, including acceptance of inadequate appraisals.  The OTS warned that the Bank should ensure that appraisals utilize all appropriate valuation methods in each case.

20.     Pursuant to 12 CFR §560.101(c), the Bank was required to monitor conditions in the real estate market in its lending area to ensure that its real estate lending policies continued to be appropriate for current market conditions.  At all relevant times the Defendants knew the real estate market in the Bank's lending area was declining.

21.     In June 2009, the OTS reiterated its concerns regarding the significant growth activity in higher-risk loans and downgraded the Bank's asset quality.

22.     Although the Bank's assets grew exponentially as a result of the aggressive growth strategy, the Bank was never profitable, its capital eroded, and its adversely classified and non-performing asset percentages increased rapidly and significantly.  Driven by losses in the Bank's portfolio of CRE, raw land, and land development loans, the Bank's adversely classified assets increased from $0 on June 30, 2007 to $49.5 million by December 31, 2010.

23.     The OTS closed Atlantic on June 3, 2011, with total assets of $208.2 million and a loss to the Deposit Insurance Fund currently estimated at $43.2 million.

**B.     Loan Policy and Loan Approval Process**

24.     The Bank's Loan Policy ("Loan Policy") in place at the time the majority of the Subject Transactions were approved was dated August 2007.  The Loan Policy was revised in December 2008 and March 2009.  Except where noted, the revisions did not materially change the policy's relevant provisions, which required the following:

a.  All concentrations in the loan portfolio were to be closely monitored for adverse financial or economic conditions;

b.  Maximum loan-to-value ("LTV") and loan-to-cost ("LTC") ratios were 65 percent for raw land loans, 75 percent for land development loans, 80 percent for commercial, multifamily, and nonresidential construction loans and loans involving rental houses, 85 percent for residential construction loans and improved property, and 90 percent for owner-occupied, residential home equity loans;

c. CRE loans required a minimum debt-service-coverage ("DSC") ratio of 1.20:1 after new debt;

d. Secured loans other than single family mortgages were limited to borrowers whose DTI ratios were 45 percent or less for gross incomes below $100,000 or 50 percent or less for gross incomes above $100,000;

e. Credit scores of at least 600 were required for all secured loans;

f. Required documentation for commercial loans included current financial statements, cash flow analyses demonstrating the borrowers' and guarantors' ability to repay, guarantees and appropriate collateral documentation, analyses of financial statements, three-years tax returns, and loan approval and presentation sheets with all essential elements of the loan;

g. Commercial loans secured by rental property required an evaluation of the lessees' ability to make the lease payments;

h. All loans were required to meet the Bank's credit risk policy guidelines;

i. Secured loans required both sufficient collateral and perfection of the Bank's security interest in the collateral;

j. A thorough and accurate appraisal that complied with all laws and regulations was required for all real estate mortgage loans; and

25.     The Loan Policy specified different levels of lending authority based on the amount of the Bank's total credit exposure to the customer.  At all relevant times, Barone had secured lending authority up to $500,000.   In December 2008, Barone was additionally given secured single loan authority up to $250,000 which could be exercised regardless of the total credit exposure of the borrower to the Bank.  Barone's authority remained the same through April 2009.

26.     Before December 2008, the EMC had authority to approve loans to customers with a credit exposure up to $1 million.  Accordingly, loans in excess of Barone's lending authority but less than $1 million required approval of the EMC.  The EMC was comprised of

three members – Barone (CCO), the President/CEO, and the Chief Lending Officer ("CLO").  In December 2008, the EMC's lending authority was reduced to $750,000 and the committee was renamed the ELC.

27.     Loans to customers with a credit exposure in excess of the EMC/ELC's lending authority required approval of the BLC, which was comprised of the Chairman of the Board (Hines) and four other Directors.  Prior to submission to the BLC, Barone reviewed the loan requests and related financial information and recommended the loans for approval by the BLC. The credit file for each loan considered by the BLC was available for the BLC to review prior to approval.

28.     When approving loans within their respective lending authorities, Barone, the EMC/ELC, and the BLC were charged with enforcing the loan policies approved by the Board, as well as adhering to prudent lending practices.

29.     The Loan Policy required that underwriting for all commercial loans comply with certain requirements, including obtaining complete financial information from borrowers, conducting financial analyses, and performing market analyses.  The Loan Policy contained prohibitions against extending "undesirable credits," which included loans lacking defined repayment programs, loans for which the borrower had not demonstrated the ability to repay, loans to businesses or individuals with negative net worth or marginal earnings, loans to a new enterprise if repayment of the loan depended on the short-term profitable operation of the enterprise, and loans that did not meet credit risk policy guidelines.

## V.  DEFENDANTS CAUSED DAMAGES

30.     The Subject Transactions described below illustrate the failures, breaches, and violations of duty committed by the Defendants that resulted in damages.  The FDIC-R seeks

compensatory damages and other relief as a result of Defendants' conduct, including as described below.

31.    Barone recommended 17 of the Subject Transactions for approval by the BLC and approved 3 of the Subject Transactions; Case approved 12 of the Subject Transactions; Chakeris approved 10 of the Subject Transactions; Cobb approved 3 of the Subject Transactions; Cole approved 7 of the Subject Transactions; Hines approved 18 of the Subject Transactions; and Owenby approved 8 of the Subject Transactions.

32.    Based on the information presented in the loan documentation and approval packages submitted to Defendants and the many glaring red flags that this information raised, Defendants knew or should have known that the Subject Transactions should not have been recommended or approved. The Defendants' negligence, gross negligence and breaches of fiduciary duty in connection with the Subject Transactions have caused damages to the FDIC-R.

33.    The Subject Transactions that evidence the Defendants' negligence, gross negligence and breaches of fiduciary duty are included in the chart below and described in further detail in the paragraphs that follow. The chart below summarizes the Defendants' roles with respect to the Subject Transactions:

| Borrower | Transaction Date | Transaction Amount | Damages[1] | Recommendations/ Approvals | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Barone | Case | Chakeris | Cobb | Cole | Hines | Owenby |
| 1.  Pavilack Industries, Inc. | June 16, 2008 | $444,000 | $442,937 | r | x | | | x | x | x |
| 2.  CHJM, LLC | June 20, 2008 | $3,200,000 | $1,915,602 | r | x | x | | x | x | |
| 3.  AL[2] #1 | July 3, 2008 | $544,000 | $113,058 | r | x | | | x | x | |

[1] Damages amounts do not include any prejudgment interest that may be available and may change based on ongoing liquidation of collateral.
[2] Borrowers referenced herein by initials represent individual borrowers whose names have been withheld to protect their privacy. The names of these borrowers will be provided once an appropriate protective order is in place.

| Borrower | Transaction Date | Transaction Amount | Damages[1] | Recommendations/ Approvals | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Barone | Case | Chakeris | Cobb | Cole | Hines | Owenby |
| 4.  AL #2 | July 3, 2008 | $1,002,700 | $301,471 | r | x | | | x | x | |
| 5.  ST | July 10, 2008 | $675,750 | $515,893 | x | | | | | | |
| 6.  DO & RM | July 11, 2008 | $222,000 | $216,248 | r | | x | x | | x | |
| 7.  Wando Park Development Group, LLC | July 16, 2008 | $2,017,500 | $896,021 | r | | x | | x | x | |
| 8.  36 Society Street, LLC | Aug. 13, 2008 | $625,000 | $324,426 | r | x | | | | x | x |
| 9.  2447 Highway 17 North, LLC | Sept. 8, 2008 | $1,000,000 | $420,461 | | | | x | | | |
| 10. 10 Whitaker Street, LLC | Sept. 10, 2008 | $1,750,000 | $410,366 | r | x | x | | | x | x |
| 11. Eagle Properties, LLC | Mar. 19, 2010[3] | $215,000 | $215,000 | r | | x | | | x | |
| 12. Turtle Bay Investments, LLC | Sept. 16, 2008 | $600,000 | $591,296 | | | | x | | | |
| 13. DT | Oct. 6, 2008 | $500,000 | $527,126 | r | | x | | | x | x |
| 14. MW | Oct. 24, 2008 | $710,000 | $175,526 | x | | | | | | |
| 15. 209 E. Gaston Street, | Oct. 27, 2008 | $2,250,000 | $731,495 | r | | x | | | x | x |
| 16. JH | Nov. 14, 2008 | $194,250 | $194,109 | x | | x | | | x | |
| 17. Inman Park Properties, | Dec. 18, 2008 | $250,000 | $245,136 | r | x | | | | x | x |
| 18. DS | Feb. 4, 2009 | $685,000 | $207,355 | r | x | | | x | x | x |
| 19. Portside Center, LLC | Feb 6, 2009 | $250,000 | $234,418 | r | x | | | | x | |
| 20. CH | Mar. 4, 2009 | $560,000 | $222,012 | r | x | x | | | x | |
| 21. Khalidi Properties, | Mar. 19, 2009 | $920,000 | $261,875 | r | x | | | | x | |
| 22. HP | April 15, 2009 | $100,000 | $101,158 | r | x | x | | x | x | x |
| **TOTALS** | | **$18,715,200** | **$9,262,989** | | | | | | | |

Key to "Recommendations/Approvals" columns: r = recommended; x = approved.

## PAVILACK INDUSTRIES, INC.

34.    Pursuant to Barone's recommendation and the approval of Case, Cole, Hines, and

---

[3] This transaction was originally extended on September 11, 2008 in the amount of $1,062,000. The transaction amount refers to the amount of a subsequent deficiency note extended to the borrower. The transaction is discussed in more detail below.

Owenby, on June 16, 2008, a $444,000 loan was extended to Pavilack Industries, Inc. ("Pavilack") to refinance two residential properties in Atlanta, Georgia ("Pavilack loan"). This loan was a portion of an original $3,000,000 loan approved for the purpose of refinancing 16 residential properties in Atlanta, Georgia. The repayment terms of the Pavilack loan were 18 months of interest only payments with principal due at the end of the 18 months. The Pavilack loan was secured by the two residential properties being refinanced.

35.    Barone, Case, Cole, Hines, and Owenby ("Pavilack Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the loan to Pavilack as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and the Interagency Guidelines for Real Estate Lending (12 C.F.R. § 560.100 and 560.101, App.) ("Regulatory Guidelines"), approval of an improper loan structure, and violations of the Loan Policy. For example:

a.    The Pavilack Defendants knew the repayment terms did not comport with prudent lending standards, as the loan required interest only payments for 18 months without scheduled principal reductions.

b.    The pre-approval analysis for the loan was inadequate and failed to comply with the Regulatory Guidelines, Loan Policy requirements, and prudent underwriting standards. The Loan Request reflected that the LTV ratio was "estimated" to be 74% based solely on the borrower's estimated values for these out-of-market properties with no information provided regarding the cost of the properties. The Pavilack Defendants' approval of the loan was not based upon appraised collateral values or cost. Moreover the Pavilack Defendants failed to take into account the current trends in the real estate market, including updating themselves on the trends of the proposed out-of-market collateral

c.    The Pavilack Defendants knew this loan violated the Loan Policy which required that all commercial real estate loans be in the Bank's market area, defined as the "Tri-County," with experienced local developers with whom the Bank had historical experience. The borrower was located in Myrtle Beach, South Carolina and the collateral was located in Atlanta, Georgia, both outside the Bank's market area. Prior to approval, the Bank had no experience with Pavilack.

d. The Loan Request lacked financial information necessary for underwriting the loan and from the information available the Pavilack Defendants knew or should have known the loan failed to comply with prudent underwriting standards and the Regulatory Guidelines. There was no financial information provided on the borrower in the Loan Request. However, the readily available information revealed that the borrower had a negative net worth, operating losses, and a DSC ratio of 0.31, significantly lower than the Loan Policy required. The primary source of repayment was the personal cash flow of the guarantor, HP (the same individual identified as the recipient of the unsecured loan discussed in more detail below). The Pavilack Defendants knew that HP was involved in a significant amount of other real estate related businesses, yet there was no global cash flow analysis on his ability to service the debt or to pay off the principal of the loan at maturity. The secondary source of repayment was the liquidation of the collateral or a refinance into the secondary market. At the time of approval, the Pavilack Defendants did not have the requisite information to determine the LTV ratio because there were no appraisals.

e. The Loan Policy and federal banking regulations required an appraisal of collateral by a state certified or licensed appraiser on real estate transactions above $250,000. The Pavilack Defendants knew the Pavilack loan violated both as the loan was in excess of $250,000 and the value of the collateral was supported only by the borrower's estimate of the property values.

f. The Pavilack Defendants knew the Pavilack loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited. The loan lacked financial information that demonstrated the ability to repay the loan, the loan was to a business with a negative net worth, and the loan did not have sufficient collateral.

36.     In November 2009, an "as is" appraisal of all 20 properties that were connected to the original approval of the $3,000,000 loan to Pavilack (which includes at least 4 properties that were not listed in the Loan Request) concluded that the properties had a total value of $400,000. The properties were originally purchased between January and December 2007 for approximately $1,267,000. The borrower incurred late charges on payments as early as February 2009. The loan was renewed in January 2010 and, after one interest payment, the borrower defaulted. A total of $442,937 was charged off by Atlantic between August 27, 2010 and December 1, 2010. The tortious conduct of Barone, Case, Cole, Hines, and Owenby in connection with the recommendation and approval of this transaction has resulted in damages of at least $442,937.

**CHJM, LLC**

37.     Pursuant to Barone's recommendation and the approval of Case, Chakeris, Cole, and Hines, on June 20, 2008, a $3,200,000 loan was extended to buy an existing participation on a total loan of $5,700,000 to CHJM, LLC ("CHJM") for which First Southern National Bank was the lead bank and had retained $2,500,000 of the loan ("CHJM loan"). The collateral for the loan was a first mortgage on a 5 parcel property consisting of 306 acres of raw land. The terms of repayment were 90 days interest only.

38.     First Southern National Bank had originally extended the $5.7 million loan to CHJM in October of 2006, and had sold $3.2 million in participations to two other banks. The purpose of the loan was to refinance the purchase of the underlying collateral, for which the borrower purportedly had a contract to sell. When the collateral had not sold as anticipated, First Southern persuaded the then-participating banks to agree to a 90-day extension of the loan, but they refused to extend the loan any further. On or about the date that the existing participation was due to expire, CHJM requested the Bank to purchase the $3.2 million participation and extend it for an additional 90 days.

39.     Barone, Case, Chakeris, Cole, and Hines ("CHJM Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the CHJM loan as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, and violations of the Loan Policy. For example:

   a.   The CHJM Defendants knew the loan failed to comply with prudent underwriting standards, the Regulatory Guidelines and the Loan Policy as the information provided to them was not sufficient to determine the adequacy of the borrower's capacity to service the debt or accurately assess the level of risk.

b. The CHJM Defendants had no information from which to determine the adequacy of the source of repayment. The loan request stated that the primary source of repayment "will be a new loan consisting of new partners." However, no such new partnership had been formed and the CHJM Defendants had no financial information on the proposed new partners.

c. The loan request reflected that the secondary source of repayment would be the personal income of the guarantor, CH. The CHJM Defendants had no information with which to adequately assess this secondary source of repayment. The CHJM Defendants knew the bulk of CH's assets were comprised of holdings in closely held real estate investments, but there was no global cash flow analysis of CH. CH's personal financial information provided to the CHJM Defendants with the Loan Request reflected that his assets were illiquid, comprised primarily of real estate and closely held companies, and that his adjusted net worth was a negative $341,000.

d. The loan request reflected that the CHJM loan would ultimately be paid off with the sale of the property. The CHJM Defendants knew that they did not have enough information to determine the adequacy of this source of repayment. The loan request reflected that the collateral had been purchased for $3.5 million and was to be developed into 560 residential lots, but that no such development had yet occurred. None of the loan proceeds were for the development of the collateral and the Bank had no "as is" appraisal of the property. Moreover, the CHJM Defendants knew that the original participating banks would not renew their participation because the property had not sold over the previous 18 months as expected and that the anticipated buyer had backed out of the deal.

e. The CHJM Defendants knew the CHJM loan was an undesirable loan pursuant to the Loan Policy, and thus was prohibited. The loan did not have a defined repayment program or provide financial information that demonstrated the ability of the borrower or guarantor to repay the loan. In addition, the guarantor had a negative adjusted net worth.

40.     The CHJM Defendants knew that the CHJM loan had numerous red flags prior to approval. Indeed, the Credit Memo revealed the difficulty the borrower had experienced in attempting to sell the property, and that the current participating banks refused to further extend the loan. Despite these red flags, the loan was recommended, presented and approved on the day that the current participation was maturing.

41.     The proposed new partners never materialized, nor did a buyer for the property. Not surprisingly, the loan was renewed three times, no principal payments were ever made, and

the borrower made no interest payments on the outstanding balance after June 29, 2010. The tortious conduct of Barone, Case, Chakeris and Hines in connection with the recommendation and approval of this transaction has resulted in damages of at least $1,915,602.

**AL #1**

42.    Pursuant to Barone's recommendation and the approval of Case, Cole, and Hines, on July 3, 2008, a $544,000 loan was extended to AL ("AL #1 loan"). The purpose of the loan was to refinance existing debt and pay closing costs of approximately $351,000 on a rental home in Charleston, South Carolina, and to provide a cash-out to the borrower of approximately $193,000. The terms of the loan were interest only for two years. The loan was secured by a first mortgage on the rental property together with an assignment of rents, leases, and profits.

43.    Barone, Case, Cole, and Hines ("AL #1 Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the AL #1 loan as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, failure to comply with prudent lending standards, violations of the Loan Policy, and approval of an improper loan structure. For example:

a.    The pre-approval analysis was inadequate and failed to comply with prudent lending standards. The Loan Request was internally inconsistent, referring to the property both as AL's primary residence and also as "investment property." However, the Loan Request stated AL lived and worked in Fayetteville, Georgia, and the collateral included an assignment of rents, leases, and profits, contradicting the statement that the property was the borrower's primary residence. In addition, the appraisal noted that the property was occupied by a tenant.

b.    The AL #1 Defendants knew the LTV ratio violated the Loan Policy. The collateral was clearly rental property as the Loan Request referred to it as "investment property," and reflected as collateral an assignment of rents, leases, and profits. Therefore, the property was subject to a maximum LTV ratio of 80% at the time of funding. The LTV ratio reflected in the Loan Request was 85%.

c.  Because the Loan Request for the AL#1 loan made no reference to an appraisal the AL #1 Defendants should have inquired about it.  Had they inquired, the AL#1 Defendants would have discovered that the appraisal was inadequate.  Federal banking regulations require an appropriate evaluation of real property collateral that is consistent with safe and sound banking practices, and the Loan Policy required an independent appraisal that complied with all laws and regulations.  The approval of this loan using the May 16, 2008 appraisal violated these provisions because as an evaluation of an income-producing property for a loan whose source of repayment was the rental income, the appraisal should have described the current and expected use of the property and should have included an analysis of the property's rental income and expenses, but failed to do either.

d.  The AL #1 Defendants knew the source of repayment, AL's personal cash flow, was inadequate.  Based on the personal financial statement provided by AL, his average cash flow over the three-years preceding the loan was $189,607.  Including the interest-only payments on the proposed loan, AL's annual debt service requirements were $183,048, resulting in a DSC ratio of 1.04, well below the 1.20 required by the Loan Policy.  In addition, both before and after the loan, the Loan Request reflected that AL's DTI ratio was well above the 50% maximum set forth in the Loan Policy.  AL also had limited liquidity of only $130,000.

e.  The AL #2 loan, discussed below, was funded at the same time as the AL#1 loan.  The AL#1 Defendants did not consider the negative impact of the AL #2 loan on AL's ability to service the combined debt.

f.  The Loan Request contained no information concerning the lessee's ability to continue to pay rent as required by the Loan Policy.

g.  The AL #1 Defendants knew the AL #1 loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  The financial information provided did not demonstrate AL's ability to repay the loan, the Loan Request included no analysis of the rental income generated by the property or the tenant's ability to satisfy the lease obligations as required by the Loan Policy, the DSC and DTI ratios violated Loan Policy requirements, and the LTV ratio violated Loan Policy Requirements.

44.     Neither the rental income from the property nor AL's other cash flow could support the debt.  Soon after the interest-only term ran out, AL could not repay the principal and the Bank placed the AL#1 loan on non-accrual.  The property was sold in a short-sale in March 2011 and the Bank received $417,000.  Atlantic charged-off the balance of the AL #1 loan.  The tortious conduct of Barone, Case, Cole, and Hines in connection with the recommendation and approval of the AL#1 loan has resulted in damages of at least $113,058.

**AL #2**

45.     Pursuant to Barone's recommendation and the approval of Case, Cole, and Hines, on July 3, 2008, the same date as the AL#1 loan, a $1,002,700 loan was extended to AL (AL #2 loan"). The purpose of the loan was to purchase three condos for a purchase price of $1,190,000. The terms of the loan were interest only for two years. The collateral for the loan was the condos and an assignment of rents, leases, and profits.

46.     Barone, Case, Cole, and Hines ("AL #2 Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the AL #2 loan as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, failure to comply with prudent lending standards, use of improper loan terms, and violations of the Loan Policy. For example:

   a.  The AL #2 Defendants knew the loan violated the LTC/LTV ratio requirements of the Loan Policy. The Loan Policy required the lesser of cost or appraised value be used and specified a maximum LTC/LTV ratio of 80% on rental property. The cost of the property was $1,190,000 and the LTC ratio was 84%. Moreover, since the cash-out from the AL#1 loan was used to fund the balance of the purchase price, the Bank effectively funded 100% of the purchase price and a portion of the closing costs. The failure to require sufficient borrower equity in the property violated prudent lending standards.

   b.  The AL #2 Defendants knew that there was no adequate source of repayment for the AL #2 loan. The primary source of repayment was identified as anticipated rental income from the property. The Loan Request asserted that the property would generate monthly net operating income of $5,800, but offered no support for that calculation. In contravention of the Loan Policy, the Loan Request did not identify any tenants or provide financial information about their ability to pay rent. Moreover, the Loan Request alternatively states that the monthly payment on the AL#2 loan is $5,013 or $6,517. In either case, the anticipated rental income was insufficient to repay the debt at maturity.

   c.  Even using unsupported income and expense figures for the property, the Loan Request calculated the DSC ratio at 1.16, below the minimum Loan Policy requirement of 1.20.

d. The Loan Request calculated AL's DTI ratio at 69.44% for 2007 with a two-year average DTI ratio of 59.95%, both well above the 50% maximum DTI ratio permitted by the Bank's Loan Policy.

e. As the AL#2 Defendants knew, the secondary source of repayment, the personal cash flow of the borrower, was inadequate. The Loan Request referred the AL#2 Defendants to the cash flow analysis, which reflected that AL's average cash flow over the three-years preceding the loan was $189,607. Including the interest only payments on the proposed loan @ 6% per annum, AL's annual debt service requirements were $205,986, resulting in a DSC ratio of 0.92, well below the 1.20 required by the Loan Policy. In addition, AL had limited liquidity of only $130,000. AL's cash flow could not support the interest only payments much less provide a source of repayment for the debt.

f. The AL #2 Defendants knew the loan provided for an inappropriate use of interest-only terms which did not comport with the Loan Policy or prudent lending standards. This loan required no principal reduction and was approved with no documentation or analysis of the borrower's ability to repay the principal at maturity.

g. The AL #2 Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited. The financial information provided did not demonstrate AL's ability to repay the loan, the Loan Request included no support for the anticipated rental income generated by the property, no documentation of any existing tenants or their ability to satisfy the lease obligations as required by the Loan Policy, the DSC and DTI ratios violated Loan Policy requirements, and the LTC ratio violated Loan Policy requirements.

47.     Soon after the interest-only term ran out, AL could not repay the principal and the Bank placed the loan on non-accrual. The tortious conduct of Barone, Case, Cole, and Hines in connection with the recommendation and/or approval of the AL#2 loan resulted in damages of at least $301,471.

**ST**

48.     Pursuant to Barone's approval, on July 10, 2008, a $675,750 loan was extended to ST ("ST loan"). Barone approved the loan in his capacity as a member of the EMC. The purpose of the loan was to purchase a vacant residential lot. The terms of the loan were interest-only payments for 24 months. The collateral was a first mortgage on the residential lot.

49.     Barone was negligent and grossly negligent and breached his fiduciary duty in approving the loan to ST as evidenced by, among other things, his failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, approval of improper loan terms and violations of the Loan Policy.  For example:

a.  Barone knew the ST loan violated the Loan Policy's LTC/LTV ratio requirements. The Loan Policy specified a maximum LTC/LTV ratio of 80% on residential lots. The cost of the property was $795,000 and the LTC ratio was 85% in violation of the Loan Policy.  The Loan Request reflected that ST was purchasing the property from a related company, the ST Company, which was the developer of the subdivision and the Purchase Agreement reflected the ST Company had in turn contracted to purchase the property from an individual named LP.  Because the Loan Request clearly reflected that this was a related party sale, Barone should have inquired about the cost of the property.  Had he inquired, Barone would have learned that the property was purchased from LP for $667,327.  Thus, the loan actually provided 100% financing with no borrower equity.

b.  Barone knew the ST loan lacked a viable repayment source.  The purpose of the loan was to purchase raw land with no plans for future development.  The primary source of repayment was the liquidation of the collateral.  As such, the loan was a land speculation loan.  However, having financed more than 100% of the purchase price in a declining real estate market, Barone obtained no documentation to support a conclusion that the property could be resold at a profit prior to maturity.  At a minimum Barone should have reviewed the appraisal, which noted difficulty in finding recent comparable sales.  For that reason, one of the comparable sales had occurred in 2006, almost two years before the appraisal.

c.  The secondary source of repayment was the personal cash flow of ST.  The Loan Request contained no cash flow information to support ST's ability to repay the debt, but referred to the cash flow analysis prepared by the credit department.  However, the cash flow analysis was incomplete and inconsistent with the financial statement attached to the analysis.  For instance, the cash flow analysis showed personal debt of only $687,138, whereas ST's financial statement showed debt in excess of $5.6 million.  ST's financial statement reflected numerous interests in closely held real estate ventures yet there was no global cash flow analysis to permit a reasonable conclusion that ST had the ability to repay the debt.  On the contrary, ST's personal financial information indicated that he had liquid assets of only $325,000.

d.  Barone knew the ST loan provided for an inappropriate use of interest only terms which did not comport with the Loan Policy or prudent lending standards.  The Loan Policy permitted 12 months of interest-only payments for residential lots only in

18

limited cases.  This loan provided for 24 months of interest-only payments, required no principal reduction, and was approved with no documentation or analysis of the borrower's ability to repay the principal at maturity.

e.  Barone knew the ST loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  The financial information provided did not demonstrate ST's ability to repay the loan, the Loan Request provided no basis for concluding that the collateral could be sold at a profit before maturity, and the LTC ratio violated Loan Policy requirements.

50.     ST could not even make the interest-only payments and defaulted on the loan in February 2010.  At that time, the value of the collateral had declined so much that the borrower was willing to walk away from the loan.  Barone's tortious conduct in connection with the approval of the ST loan has resulted in damages of at least $462,761.

**DO & RM**

51.     In or about April 2008, Defendant Darrell Owenby ("DO"), a director and BLC member, and his co-borrower RM obtained a $1.4 million insider loan from the Bank to finance the build-out, FF&E, improvements and renovations of a Wild Wings franchise located in Jacksonville, Florida.

52.     Pursuant to Barone's recommendation and the approval of Chakeris, Cobb, and Hines, on July 11, 2008, an additional $222,000 insider loan was extended to DO & RM ("DO & RM loan").  The purpose of the loan was to finance cost overruns in connection with the build-out and renovation of the Wild Wings franchise that was the subject of the previous $1.4 million loan.  The terms of the loan were interest only until April 2009 followed by principal and interest payments based on a 10-year amortization, with a final balloon payment due in April 2013.  The loan was secured by a fourth mortgage on RM's personal residence and a third mortgage on DO's personal residence.

53.    Barone, Chakeris, Cobb, and Hines ("DO & RM Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the loan to DO & RM as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, and violations of the Loan Policy.  For example:

    a.   The pre-approval analysis and underwriting was inadequate and did not comply with industry standards and the DO & RM Defendants had no basis for determining the adequacy of the source of repayment.  The primary source of repayment was the projected cash flow of the Wild Wings franchise, which was also the primary source of repayment of the earlier $1.4 million loan.  However, the Loan Request contained no documentation to support the projected cash flows or the resulting DSC ratio calculations.

    b.   The secondary source of repayment was the personal cash flow of DO & RM, but the Loan Request did not provide adequate financial information to document their ability to repay the debt.  The borrowers' combined debt was almost $14 million, but they had liquid assets of only $1.95 million.  The Loan Request included no global cash flow analysis or other information to document the borrowers' ability to service their debts.  The DSC ratio calculations were based on stale 2006 information, which should have led the DO & RM Defendants to probe deeper into the borrowers' finances.  RM's 2007 tax return reflected $0 taxable income to service debts totaling $4.1 million.  DO's 2007 tax return reflected after tax income of $663,208 to service debts totaling $9.7 million.

    c.   The third and fourth mortgages on DO's and RM's personal residences did not secure repayment of the debt.  DO's home was appraised at $4.5 million, but the first two liens totaled approximately $4 million, all but $120,000 of the lendable value of the property (using the Loan Policy limit of 90%).  The value of RM's home was reported at $2.7 million, but the existing mortgages represented the entire lendable value of the property.  Moreover, the Bank could not dispose of the collateral without buying out the prior liens, rendering any recovery on the collateral unlikely in the event the borrowers defaulted on the loan.

    d.   The DO & RM Defendants knew this loan violated the Loan Policy requirement that all commercial real estate loans be in the Bank's market area, defined as the "Tri-County." The loan was to finance cost overruns in the build out of a Jacksonville, Florida, property outside the Bank's market area.

     e.   The DO & RM Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and should not have been extended.  The financial information provided did not demonstrate the borrowers' ability to repay the loan and the debt could not be recouped from disposition of the collateral.

54.     DO & RM defaulted on the loan, which was charged off in August 2010.  The tortious conduct of Barone, Chakeris, Cobb, and Hines in connection with the recommendation and approval of this transaction has resulted in damages of at least $216,248.

**WANDO PARK DEVELOPMENT GROUP, LLC**

55.     Pursuant to the recommendation of Barone and the approval of Chakeris, Cole, and Hines, on July 16, 2008, a $2,017,500 loan was extended to Wando Park Development Group, LLC ("Wando Park").  The purpose of the Wando Park loan was to refinance the development of six commercial lots, originally financed by First National Bank of the South ("FNBS").  The terms of the loan were 12 months interest only.  The loan was secured by a first mortgage on the six commercial lots.

56.     Barone, Chakeris, Cole, and Hines ("Wando Park Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the loan to Wando Park as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, approval of improper loan terms, and violations of the Loan Policy.  For example:

     a.   The Wando Park Defendants knew that the principals of Wando Park—TS, DT and JS—were unable to pay their debts as they matured.  TS, DT and JS had originally financed the Wando Park development through FNBS.  After spending the funds obtained from FNBS, the project remained incomplete.  In December 2007, the Wando Park principals obtained a 60-day $250,000 loan from Atlantic to complete the project.  The Wando Park principals could not repay the 60-day loan at maturity and the Bank extended the term for an additional 90 days.  At the end of the 90-day extension, the Wando Park principals were still unable to repay the $250,000 loan.  Instead, they requested Atlantic to refinance the entire project for $2,017,500

b. The pre-approval analysis and underwriting for the loan was inadequate and failed to comply with prudent lending standards.  The information set forth in the Loan Request was insufficient to determine the borrower's and guarantors' ability to repay the loan.  The primary source of repayment was the personal cash flow of the guarantors.  However, there was no global cash flow analysis for any of the guarantors.  Moreover, the Loan Request reported TS's 2007 DSC ratio as 0.31 and his liquid assets were only $25,000.  No DSC ratio was provided for DT, but a cash flow worksheet revealed a negative cash flow for the previous three years. JS's DSC ratio was only 1.0 in 2006 and no DSC ratio was provided for 2007.  The DSC ratios of the guarantors, individually and collectively, were well below the 1.20 requirement of the Loan Policy.  The Loan Request did not provide DTI ratios for the guarantors, but a 2009 annual loan review reflected that their DTI ratios exceeded the 40% Loan Policy requirement.  In addition, the total assets of the guarantors primarily consisted of closely held interests with minimal liquid assets.

c. At the time they approved the loan, the Wando Park Defendants knew that the real estate market was declining and that it would "be tough" to liquidate the collateral. The Loan Request was prepared as three separate loans, one to each guarantor, each collateralized by two lots.  However the Wando Park Defendants approved the loan as a single loan to Wando Park.  As such the Wando Park Defendants should have inquired about the appraised value for the 6 lots as a whole. Because the appraisal provided a bulk sale value for the lots of $2,230,000, representing an LTV ratio of more than 90%, the Wando Park Defendants should have known the LTV was well in excess of the maximum LTV ratio set forth in the Loan Policy.

d. The Wando Park Defendants knew the loan provided for an inappropriate use of interest-only terms which did not comport with the Loan Policy or prudent lending standards.  The loan required no principal reduction and was approved with no documentation or analysis of the borrower's ability to repay the principal at maturity.

e. The Wando Park Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  The financial information did not demonstrate that the borrower and guarantors had the ability to service the debt or repay the loan at maturity.  In addition, the loan lacked sufficient collateral and violated the Loan Policy's LTV, DSC and DTI ratio requirements.

57.    The loan was renewed at least two times before a forbearance agreement was entered into by the Bank and the guarantors/borrower.  The forbearance agreement split the loan into three separate loans to each guarantor/borrower in the amounts of $315,000 to JS, $365,000 to TS, and $1,115,000 to Wando Park and DT.  Ultimately, the borrowers and guarantors defaulted.  The tortious conduct of Barone, Chakeris, Cole, and Hines in connection with the

recommendation and approval of this transaction has resulted in damages of at least $896,021.

**36 SOCIETY STREET, LLC**

58.    Pursuant to the recommendation of Barone and the approval of Case, Hines, and Owenby, on August 13, 2008, a $625,000 loan was extended to 36 Society Street, LLC ("36 Society"), a single-member limited liability company owned by PW ("36 Society loan").  The purpose of the loan was to refinance a HELOC on PW's primary residence.  The terms of the loan were interest only for 24 months.  The loan was secured by a second mortgage on PW's residence.

59.    Barone, Case, Hines, and Owenby ("36 Society Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the loan to 36 Society as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, approval of improper loan terms, and violations of the Loan Policy.  For example:

a.    The Loan Policy dictated that the LTV ratio for home equity loans should not exceed 90%, and the Regulatory Guidelines permitted an LTV ratio of 90% with a credit enhancement of either mortgage insurance or readily marketable collateral.  The 36 Society Defendants knew their approval of this loan violated both.  Although PW's residence had been appraised at $2,500,000, at a BLC meeting, Chakeris informed the 36 Society Defendants that this appraisal was highly inflated and inaccurate, that he had owned that property and had sold it to the borrower for $1,800,000 "at the peak of the market," and that the value of the property in "today's market" was a maximum of $2,000,000.  The first mortgage on the property was $1,500,000, thus, using Chakeris's estimate, the LTV ratio on the 36 Society loan was over 100%.

b.    The 36 Society Defendants knew the interest only terms of the loan were inappropriate and did not comport with prudent lending standards or the Loan Policy.

c.    The pre-approval analysis was inadequate and did not comply with prudent underwriting standards and the 36 Society Defendants did not have sufficient information to determine if the source of repayment was adequate.  The primary source of repayment was PW's personal cash flow.  At the time, PW had liquid assets

of only $446,208 and direct liabilities (not including the proposed debt) of $2.3 million.  In addition, PW had contingent liabilities of more than $11 million.  Moreover, the cash flow analysis of PW's companies revealed serious debt service coverage issues, as many had negative DSC ratios.  As reported in the Loan Request, only two of PW's companies had positive cash flow.  The global cash analysis reflected a global DSC ratio of 0.6 and a cash deficit of $545,688.  Despite the correctly calculated global DSC ratio of only 0.6, the Loan Request attempted to justify a global DSC ratio of 1.37 by making certain assumptions and removing certain obligations from the calculation. The 36 Society Defendants knew or should have known that the Loan Request did not support or properly justify the assumptions used to achieve an "adjusted" DSC ratio of 1.37 and could not be relied on in determining the adequacy of the source of repayment.  An annual loan review performed in January 2010, reflected a 2007 global DSC ratio of 0.44 and a negative 0.34 global DSC ratio for 2008.

d.  The 36 Society Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and should never have been extended.  The financial information did not demonstrate that the borrower and guarantor had the ability to repay the loan at maturity.  In addition, the loan lacked sufficient collateral and violated the Loan Policy's LTV and DSC ratio requirements.

60.    The loan proceeds were advanced throughout the summer and fall of 2008.  Late charges were assessed to the borrower beginning in August 2009.  The borrower could not even make the interest-only payments and the borrower made no payments after March 31, 2010.  The loan was charged off on December 28, 2010.  The tortious conduct of Barone, Case, Hines, and Owenby in connection with the recommendation and approval of this transaction has resulted in damages of at least $324,426.

## 2447 HIGHWAY 17 NORTH, LLC

61.    Pursuant to the approval of Cobb in excess of his lending authority, on September 8, 2008, a $1,000,000 loan was extended to 2447 Highway 17 North, LLC ("2447 Highway 17") to purchase a building and land located in Mt. Pleasant, South Carolina, which was to be owner occupied ("2447 Highway 17 loan").  The terms of the loan were interest only for 6 months converting to principal and interest payments based on 25-year amortization with 5-year maturity.  The loan was secured by a first mortgage on the subject property.

62.    Cobb was negligent and grossly negligent and breached his fiduciary duties in approving the loan to 2447 Highway 17 as evidenced by, among other things, his failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, failure to obtain proper approval, and violations of the Loan Policy. For example:

a.    The 2447 Highway 17 loan was not properly approved and Cobb's approval was a violation of the Loan Policy as Cobb had no individual lending authority except to approve overdrafts up to $25,000. The loan required EMC approval, which Cobb failed to obtain.

b.    Cobb knew there was no adequate source of repayment for this loan. The Loan Request listed the primary source of repayment as the cash flow of a company referred to as Beachside Realty. However, Beachside Realty was not a party to the transaction and did not guarantee the debt. Moreover, the Loan Request clearly showed that Beachside Realty sustained losses and had negative cash flow in 2006 and 2007, resulting in negative DSC ratios that violated the Loan Policy. In addition, Beachside Realty's income was derived from the real estate market which was declining. The Loan Request stated that Beachside Realty expected sales to stay flat in 2008, *i.e.*, the same as 2007. As noted, Beachside Realty had a negative cash flow in 2007.

c.    The secondary source of repayment was the personal cash flow of guarantors VH and JH. Not including the proposed debt, VH had existing debt obligations of $35,091 per month and JH had existing debt obligations of $31,439 per month. The cash flow analysis attached to the Loan Request reflected that, without including the proposed debt, JH had insufficient cash flow to cover existing debts in 2006 and 2007, resulting in DSC ratios of 0.55 and 0.75 in 2006 and 2007, respectively. The Loan Request showed that JH had a substandard "projected" DSC of 1.13 and VH had even poorer DSC ratios of 0.67 and 0.96 in 2005 and 2006, respectively. VH also had a low credit score. Because of the known real estate holdings and businesses of the guarantors Cobb knew a global cash flow analysis was needed, but this was not performed.

d.    The loan made inappropriate use of interest-only and 25-year amortization terms with a five year balloon payment. These terms did not comport with prudent lending standards or the Loan Policy, which required amortization of 20 years or less.

e.    Cobb knew the 2447 Highway 17 loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited. The loan was approved without proper authorization and the financial information did not demonstrate that the borrower and guarantors had the ability to repay the loan at maturity.

63.    Late charges were assessed only three months after the loan was extended and became a regular occurrence over the life of the loan.  The borrowers ultimately defaulted.  Accordingly, Cobb's tortious conduct in connection with the approval of the 2447 Highway 17 loan has resulted in damages of at least $420,461.

## 10 WHITAKER STREET, LLC

64.    Pursuant to Barone's recommendation and the approval of Case, Chakeris, Hines and Owenby, on September 10, 2008, a $1,750,000 loan was extended to 10 Whitaker Street, LLC ("Whitaker"), a single-member limited liability company owned by JN ("Whitaker loan").  The purpose of the loan was to refinance existing debt on a commercial office building in Savannah, Georgia.  The terms of repayment were 35 months of principal and interest based on a 20-year amortization and a final balloon payment of $1,579,073 in the 36th month.  The loan was secured by a first mortgage on the subject property.

65.    Barone, Case, Chakeris, Hines, and Owenby ("Whitaker Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the Whitaker loan as evidenced by, among other things, the Defendants' failure to undertake or require an adequate pre-approval analysis, violations of the Loan Policy, and failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines.  For example:

   a.    The Whitaker Defendants did not have adequate information to determine the adequacy of the loan's source of repayment.  The primary source of repayment was rental income from the office building.  The Loan Policy stated that commercial loans secured by rental property required an evaluation of the lessees' ability to make the lease payments and no such evaluation was performed.

   b.    The Loan Request contained no discussion as to the borrower's ability to pay the $1.6 million balloon payment due at maturity.  Even assuming the Bank received the entire gross rents of $16,600, that was barely enough to service the debt and evidenced no ability to make the final balloon payment due at maturity.

c.   The Whitaker Defendants knew the loan's secondary source of repayment, the guarantor, JN, was inadequate.  The Loan Request reflected that JN had a low credit score, which violated the Loan Policy requirements, and very little liquidity.  Moreover, the Loan Request contained no global cash flow analysis of JN's ability to repay his debts and no calculation of his DTI ratio.

d.   The Whitaker Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  The Whitaker Loan Request contained no financial information or analysis to demonstrate the borrower's or guarantor's ability to repay the loan at maturity.

66.     Less than two months after the Whitaker loan closed late charges were assessed and were repeatedly incurred throughout most of the life of the loan.  The loan was renewed at least once and the borrower made no payments on the outstanding balance after May 31, 2011.  The tortious conduct of Barone, Case, Chakeris, Hines, and Owneby in connection with the approval of the Whitaker loan has resulted in damages of at least $410,366.

**EAGLE PROPERTIES, LLC**

67.     Pursuant to Barone's recommendation and the approval of Chakeris and Hines, on September 11, 2008, a $1,062,500 loan was extended to Eagle Properties, LLC ("Eagle"), a limited liability company owned by RN and his wife, DN ("Eagle loan").  The purpose of the loan was to enable Eagle to purchase an office building located at 6926 Rivers Ave in North Charleston, South Carolina ("6926 Rivers").  The building was to be occupied by an insurance agency owned by RN ("RN Agency").  At the time, RN Agency leased space from Eagle at 6650 Rivers Ave, North Charleston, South Carolina ("6650 Rivers"), a separate property owned by Eagle that secured a $2.5 million loan to the Bank.  The terms of repayment of the Eagle loan were 59 months of principal and interest based on a 20-year amortization and a final balloon payment of $869,707 in the 60th month.  The loan was secured by a first mortgage on the subject property.

68.     Barone, Chakeris, and Hines ("Eagle Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the Eagle loan as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting and lending standards as set forth in the Loan Policy and Regulatory Guidelines, and violations of the Loan Policy.  For example:

   a.  The Eagle Defendants knew the loan's source of repayment was inadequate.  The primary source of repayment was the anticipated rental income from 6926 Rivers, which was to be occupied by RN Agency.  RN Agency had been renting space from 6650 Rivers and was planning to move to a smaller space in 6926 Rivers. The debt service on the proposed loan was approximately $7,920/month or approximately $95,000 per year during the amortized portion of the loan.  The Loan Request does not specify the amount of the lease payments that Eagle anticipated receiving from RN Agency, but RN Agency's 2007 tax return reflected that it paid gross rent of $85,000 while located at the 6650 Rivers location.  Thus, the anticipated rent from RN Agency, less expenses, was not sufficient to service the debt, much less repay the balloon payment due at maturity.

   b.  The secondary source of repayment was the rental income from 6650 Rivers upon which the Bank was already relying to service existing debt of $2,500,000.  The debt service on the $2.5 million loan was approximately $18,000 per month or $216,000 per year.  The combined debt service on the existing loan and the proposed loan was approximately $312,000 annually.  The Loan Request reflects that Eagle's average annual cash flow for the years 2005, 2006 and 2007 from all of its properties, not just 6650 Rivers, was approximately $360,000, resulting in a DSC ratio of 1.15, which falls below the Loan Policy requirement of 1.20.

   c.  The Loan Request did not calculate Eagle's DTI ratio as required by the Loan Policy.  Had the Eagle Defendants inquired, they would have learned that Eagle had a 2007 gross income of $916,937 and existing debt of approximately $6.4 million.  Annual debt service on $6.4 million @ 6.5% over 20 years equals $572,604, yielding a DTI ratio of 62%, well in excess of the 50% limit permitted by the Loan Policy.

   d.  Especially in light of Eagle's high DTI ratio and low DSC ratio, the Eagle Defendants should have required a global cash analysis, without which the Eagle Defendants could not reasonably analyze Eagles' ability to repay its debts as they matured.

   e.  The Loan Request listed recourse against RN as a third source of repayment, but also noted that RN had a low credit score, very little liquidity, and negative cash flow.

    f.   The Eagle Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  The Eagle Loan Request contained no financial information or analysis to demonstrate the borrower's or guarantor's ability to repay the loan at maturity.

69.     The Eagle loan did not pay as agreed and the Bank ultimately took possession of the collateral.  After a sale of the collateral, the Bank obtained a deficiency note for $215,000 from Eagle and RN.  No payments were ever made on the deficiency note and the Bank charged off $215,000 on April 28, 2010 The tortious conduct of Barone, Chakeris, and Hines in connection with the recommendation and approval of the Eagle loan resulted in damages of at least $215,000

**TURTLE BAY INVESTMENTS, LLC**

70.     Pursuant to the approval of Cobb in excess of his lending authority, on September 16, 2008, a $600,000 loan was extended to Turtle Bay Investments, LLC ("Turtle Bay"), a limited liability company owned by JH and PL ("Turtle Bay loan").  The purpose of the loan was to fund a related entity's construction of 14 units of a townhouse project in Mt. Pleasant, South Carolina.  The terms of the loan were 12 months interest-only payments.  The loan was to be secured by a lien on brokerage accounts of guarantor JH valued at over $723,459, but Cobb authorized the loan and the Bank funded the loan without obtaining the assignment documentation required to perfect the Bank's security interest in JH's accounts.

71.     Cobb was negligent and grossly negligent and breached his fiduciary duties in approving the loan to Turtle Bay as evidenced by, among other things, his failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, failure to secure proper approval of the loan, and violations of the Loan Policy.  For example:

a.  The Turtle Bay loan was not properly approved and Cobb's approval was a violation of the Loan Policy.  Although Dean Lang, the Bank's Chief Lending Officer also approved the loan, the lending authority of Cobb and Lang, acting as the EMC, was limited to $500,000.

b.  As Cobb knew, the Turtle Bay loan violated the Loan Policy's LTV ratio requirements.  The collateral for this loan was a brokerage account valued at $723,459.  The loan was for $600,000, resulting in an LTV ratio of 83%.  The maximum LTV ratio for loans secured by publicly-traded stock was 70%.  Moreover, as noted at the September 30, 2008 BLC meeting, the Assignment of Account was not executed prior to disbursement of the loan proceeds and the loan was not secured.

c.  Cobb knew the interest-only terms of the loan were inappropriate and did not comport with prudent lending standards.  Although the borrower was expected to receive developer's fees from the sale of eight of the townhomes sufficient to repay the loan within five months, the loan provided for twelve months of interest-only payments.  Given the purpose of the loan and the anticipated source and timing of repayment, allowing the borrower an additional seven months of interest-only payments after receipt of these anticipated fees was imprudent.

d.  The financial information, documentation, and analysis were inadequate and failed to comply with prudent underwriting standards, and Cobb knew or should have known that the sources of repayment were inadequate.  The Loan Request provided no financial information on the borrower. The Loan Request listed the primary source of repayment as development fees from the sale of townhome units that were presold and scheduled to close in February 2009.  However, the borrower was not the developer of the townhomes.  The developer of the Townhomes was a related entity known as Turtle Bay Development, LLC.  Prior to approval and funding, Cobb did not obtain a security interest in the townhomes or the development fees; he did not obtain copies of the pre-sale contracts; he did not obtain an assignment or guaranty agreement from the developer; and he did not investigate whether the original construction lender would permit release of the sale proceeds to a third party.  In summary, Cobb did nothing to ensure that the Bank would receive repayment of the loan from the sale of the townhomes.

e.  Cobb should have known that the secondary source of repayment, the personal cash flow of the guarantors, was inadequate.  From the Loan Request, Cobb knew the guarantors were involved in numerous real estate projects, yet there was no global cash flow analysis to evaluate their ability to repay the debt.  Had a global cash flow analysis been performed, it would have reflected that PL's 2007 tax return showed a loss (negative earnings) of $229,488 and PL's financial statement reflected total "income" for 2007 of $789,195.  However, the bulk of the "income" listed was a one-time distribution from Turtle Bay Development in the amount of $794,058.   Turtle Bay Development's 2007 tax return reflected a loss of $76,821.  Thus, the distribution to PL was not income, but a reduction of Turtle Bay Development's operating capital.  Absent that distribution, PL had negative cash flow in 2007 and a DSC ratio of -0.19.

PL received a similar distribution in 2006 in the amount of $940,123. Absent that distribution, PL had negative cash flow in 2006, resulting in a DSC ratio of -0.9. In 2005, PL received no distribution and had negative cash flow resulting in a DSC ratio of -3.9. The other guarantor, JH, received similar distributions from Turtle Bay Development in 2006 and 2007. Absent those distributions, JH also had negative cash flow in 2005, 2006 and 2007.

f.  Cobb knew the Turtle Bay loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited. The loan was approved without proper authorization and the financial information did not demonstrate that the borrower and guarantors had the ability to repay the loan at maturity. The loan also violated the Bank's LTV ratio requirements and Cobb disbursed the funds prior to perfecting the Bank's security interest in the collateral, leaving the Bank unsecured.

72.    Late charges began being assessed in December 2008. The loan was subsequently renewed at least two times. The borrower made no payments on the outstanding balance after June 30, 2010. The loan was charged off on December 28, 2010 in the amount of $591,296. Cobb's tortious conduct in connection with the approval of the transaction has resulted in damages of at least $591,296.

**DT**

73.    Pursuant to Barone's recommendation and the approval of Chakeris, Hines, and Owenby, on October 6, 2008, a $500,000 HELOC was extended to DT ("DT loan"). The terms of the loan were 10 years interest only. The loan was secured by a second mortgage on the subject property located in Sullivans Island, South Carolina.

74.    Barone, Chakeris, Hines, and Owenby ("DT Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the loan to DT as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, approval of improper loan terms, and violations of the Loan Policy. For example:

a.  The DT Defendants knew that the primary source of repayment was inadequate and
    that DT had insufficient cash flow to service the debt.  The primary source of
    repayment was the personal cash flow of DT, who was also a guarantor of the $2
    million Wando Park loan.  Not including the Wando Park debt or the proposed debt,
    the cash flow worksheet reflected that DT had negative cash flow during the years
    2004, 2005, and 2006, resulting in DSC ratios of 0.04, 0.07, and 0.51, respectively,
    well below the Loan Policy requirement of 1.2.  The interest only payments on
    $500,000 @ 6% totaled $30,000 annually.  Excluding the proposed debt, the Loan
    Request reported DT's annual debt service requirement as $896,744.  Thus, with the
    proposed debt, DT's annual debt service requirement was approximately $926,744.
    The Loan Request failed to discuss DT's DTI.  The DT Defendants should have
    requested this information which would have revealed that DT's 2007 tax return
    reported gross income of $879,807, resulting in a DTI ratio of 105%, more than
    double the 40% maximum allowed by the Loan Policy.  DT's 2007 after tax income
    was only $699,277, over $200,000 less than his debt service requirement.

b.  The DT Defendants knew or should have known that they did not have adequate
    information to properly assess the secondary source of repayment.  The secondary
    source of repayment was the liquidation of collateral.  The $3,850,000 appraisal
    referenced in the Loan Request violated the Bank's appraisal policy in that the
    appraisal was not prepared for Atlantic.  Had the DT Defendants reviewed the
    available credit file information they would have known that a more current appraisal
    in the file valued the property for another lending institution at $3,000,000, resulting
    in a LTV ratio of 93%, a violation of the Loan Policy.  The Bank ultimately obtained
    its own appraisal in August of 2008 which reflected a value of $3,200,000.  Even at
    this value, the resulting LTV ratio was 87%.  At a minimum the DT Defendants
    should have known that the real estate market was declining and that the value of this
    property was likewise declining.  Atlantic would have to pay off the first mortgage in
    order to foreclose on its second mortgage, thus the liquidation of the collateral was
    neither an adequate nor readily available source of repayment.

c.  The final source of repayment was recourse against DT.  However, most of DT's
    assets were encumbered real estate and interests in closely-held business.  DT had
    liquid assets of only $245,000 and he was already a guarantor on the $2 million
    Wando Park loan.

d.  The DT Defendants knew that the terms of the loan, 10 years of interest-only
    payments followed by a balloon payment, did not comport with prudent lending
    standards.

e.  The DT Defendants knew the loan was an undesirable loan and thus was prohibited.
    The financial information provided did not demonstrate an ability to repay the loan.
    The loan allowed 10 years of interest-only payments to a borrower that was already
    indebted to the Bank for over $2,000,000 and whose financials revealed that he could
    not reasonably service the debt or pay the loan off at maturity.

75.     The loan was disbursed throughout 2008 and 2009.  In the month following full disbursement, the borrower began incurring late fees.  The borrower made no  payments on the outstanding balance after April 26, 2011.  The tortious conduct of Barone, Chakeris, Hines, and Owenby in connection with the recommendation and approval of this transaction has resulted in damages of at least $527,126.

**MW**

76.     Pursuant to the approval of Barone, on October 24, 2008, a $710,000 loan was extended to MW for the purpose of acquiring and renovating a residential quadriplex in Charleston, South Carolina ("MW loan").  The terms of repayment were interest only for 12 months, 47 months of principal and interest based on a 20-year amortization and one final balloon payment of $627,689 in the 60th month.  The loan was secured by a first mortgage on the subject property.

77.     Barone was negligent and grossly negligent and breached his fiduciary duties in approving the MW loan as evidenced by, among other things, approval of the loan in excess of his lending authority, failure to undertake or require an adequate pre-approval analysis, violations of the Loan Policy, reliance on an inappropriate appraisal methodology, and failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines.  For example:

a.  Barone failed to obtain proper approval for the MW loan.  Barone's individual lending authority was only up to $500,000.  Loans in excess of $500,000, but less than $1,000,000, required approval of the EMC.

b.  Barone knew the loan's source of repayment was inadequate to repay the debt.  The Loan Request identified the primary source of repayment as the refinance of the project upon completion of the renovations.  However, the Loan Request contained no evidence or discussion of a take-out commitment.  The secondary source of repayment was the anticipated rental income generated by the project.  However, the project would not generate rental income during renovation.  After renovation, the

anticipated rental income was only $5,300, which was less than the monthly payments of the amortized portion of the loan. The tertiary source of repayment was recourse against the borrower and/or liquidation of the collateral. At the time of approval, MW had liquid assets of only $218,000.

c. The loan provided 100% financing of the purchase and renovation of the property with no borrower equity, which violated Loan Policy requirements.

d. Barone failed to analyze properly the borrower's cash flow or her ability to service the debt during the term or repay the principal at maturity.

e. Barone knew the appraisal was inadequate. Federal banking regulations require an appropriate evaluation of real property collateral that is consistent with safe and sound banking practices, and the Loan Policy required an independent appraisal that complied with all laws and regulations. The appraisal used in the approval of this loan violated these provisions because as an evaluation of an income-producing property for a loan whose source of repayment was the rental income, the appraisal did not describe the current and expected use of the property or include an analysis of the property's rental income and expenses. The appraisal did not value the property as income-producing property, which is necessary when the source of repayment is rental income.

f. The MW loan provided for an inappropriate use of interest-only payments and a 20-year amortization schedule over a five-year term to purchase and renovate rental property that was not projected to produce sufficient income to service the debt, much less repay the principal due at maturity.

g. Barone knew the MW loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited. The financial information and analysis did not demonstrate the borrower's or guarantor's ability to repay the loan at maturity.

78.    Late charges began being assessed in June 2009. Late charges were incurred repeatedly over the life of the loan. The borrower made no payments on the outstanding balance after August 25, 2010. Barone's tortious conduct in connection with the approval of this transaction has resulted in damages of at least $175,526.

**209 EAST GASTON STREET, LLC**

79.    Pursuant to Barone's recommendation and the approval of Chakeris, Hines and Owenby, on October 27, 2008, a $2,250,000 loan was extended to 209 East Gaston Street, LLC ("Gaston"), another single-member limited liability company owned by JN ("Gaston loan"). The

purpose of the loan was to refinance existing debt and to extend new funds for the renovation of a bed and breakfast in Savannah, Georgia.  The terms of repayment were six months interest only with 53 months of principal and interest based on a 20-year amortization and a final balloon payment of $1,912,457 in the 60th month.  The loan was secured by a first mortgage on the subject property.

80.     Barone, Chakeris, Hines and Owenby ("Gaston Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the Gaston loan as evidenced by, among other things, the Defendants' failure to undertake or require an adequate pre-approval analysis, violations of the Loan Policy, and failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines.  For example:

a.   The Gaston Defendants knew the loan's source of repayment was inadequate. Repayment was to be from the operations of the bed and breakfast, yet, based on its financials presented to the Gaston Defendants, the borrower's 2006 net cash flow was insufficient to service the debt and was only marginally sufficient based on 2007 financials. Other than cash flow information, the Loan Request contained no information on the borrower.  Had the Gaston Defendant's obtained such information it would have revealed that the Gaston property produced only $29,070 in net income in 2007.  In addition since the loan was for renovations to the property, some or all of the property would have to be closed for renovations following disbursement of the loan proceeds.  The Loan Request contained no discussion or analysis of the borrower's ability to pay the $1.9 million balloon payment due at maturity.

b.   The Gaston Defendants knew the pre-approval analysis of the loan was inadequate. The Bank had extended the $1,750,000 Whitaker loan to another JN entity a month earlier and, while the Gaston loan would increase JN's total debt to the Bank to approximately $4 million, his financial information reflected that he had liquid assets of only $3.8 million against direct and contingent liabilities of approximately $195 million.  However, the Loan Request contained no global cash flow analysis of JN's ability to repay his debts and no calculation of his DTI ratio.

c.   The Gaston Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  There was no financial information or analysis to demonstrate the borrower's ability to repay the loan at maturity.

d.  The Gaston Defendants failed to comply with prudent lending and underwriting standards regarding the Gaston loan in that the borrower had no demonstrated ability to repay the debt.  The primary source of repayment was the net cash flow generated from the operation of the bed and breakfast, which depended on tourism.  The Loan Request noted the turbulence of the tourism market as a recognized weakness, stating that occupancy rates were down to 63% in Savannah.  Moreover, the borrower's net cash flow was barely sufficient to service the debt during the interest only and 20-year amortization period and it had no demonstrated ability to repay the nearly $2 million in principal due at maturity.

81.     Within three months of the Gaston loan's closing, late charges began being assessed against the borrower.  These late charges were repeatedly assessed against the borrower throughout much of the life of the loan.  The borrower made no  payments on the outstanding principal after May 31, 2011.  The tortious conduct of Barone, Chakeris, Hines, and Owenby in connection with the recommendation and approval of this transaction has resulted in damages of at least $731,495.

**JH**

82.     Pursuant to the approval of Barone, Chakeris and Hines, on November 14, 2008, a $194,250 HELOC was extended to JH (the same individual who guaranteed the 2447 Highway 17 loan) ("JH loan").   JH was selling his current residence to buy a house on the Isle of Palms, South Carolina for $1.295 million.  JH financed the purchase of the house at another bank, making a down payment of $388,500 and obtaining a loan for $906,500.  The purpose of the JH loan was to fund 15% of the purchase price (*i.e.*, 50% of the down payment).  The terms of the loan were interest only for 10 years at a rate of Prime +1%.  The collateral for the JH loan was a 2nd mortgage on the house being purchased.  Because the amount of the first mortgage was stated incorrectly, the loan was originally approved on November 4, 2008 by Chakeris and Hines for $129,500 at an LTV of 85%.  Subsequently, the loan amount was increased to $194,250 with the LTV remaining at 85%, with the increase approved by Barone.

83.    Barone, Chakeris, and Hines ("JH Defendants") were negligent and grossly negligent and breached their fiduciary duties in approving the JH loan as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, failure to obtain proper approval, and violations of the Loan Policy.  For example:

    a.   Barone's approval of the increased amount of the loan was a violation of the Loan Policy.  JH's total credit exposure, which included the 2447 Highway 17 Loan, exceeded $1 million; therefore, approval of the BLC was required.

    b.   Regardless of the amount of the loan, the JH Defendants knew that there was no adequate source of repayment for the JH loan. The only source of repayment identified in the Loan Request was JH's personal cash flow.  However, the analysis of JH's financial condition was inaccurate on its face and was based on a stale financial statement.  The Loan Request noted that JH's financial statement was dated November 1, 2006, and thus was nearly two years old. The JH Defendants knew JH's DTI ratio was in violation of the Loan Policy and that he was highly illiquid.  The Loan Request provided an analysis of JH's "current" and "new" DTI; however this analysis was inadequate and inaccurate on its face and should have been questioned prior to approval.  The 2006 and 2007 DTI based on JH's current debt was listed as 137.55% and 111.32%, respectively, well in excess of the Loan Policy's requirement of 40%.  This "new" DTI was calculated at 66.17% and 53.55% for 2006 and 2007 and was also a violation of the Loan Policy.  However, as was obvious from the Loan Request, the "new" DTI calculation did not include numerous debts, including the first mortgage for the newly purchased house which was the collateral for the HELOC.  Therefore, JH's actual DTI was much higher.

    c.   In addition, the JH Defendants knew or should have known that JH's DSC ratio also violated the Loan Policy requirement of 1.20.  The Loan Request listed JH's 2006 and 2007 DSC as 2.61 and 3.65, respectively, basing that calculation on annual debt of only $79,788.  However the next page of the Loan Request reflected JH's annual debt was actually $338,000.  Given these inconsistencies, the JH Defendants should have, at a minimum, reviewed the credit department's cash flow analysis for JH. The cash flow analysis revealed JH's DSC was actually 0.55 for 2006 and 0.75 for 2007 and that his annual debt, without the new HELOC, was over $377,000.

    d.   The JH Defendants knew the JH loan made inappropriate use of interest-only terms which did not comport with prudent lending standards.  The JH loan provided for an excessive term of interest only payment (10 years) and required no timely principal reductions.

    e.   The JH Defendants knew the loan was an undesirable loan and thus was prohibited.

The financial information did not demonstrate the ability of the borrower to repay the loan.  The loan allowed 10 years of interest-only payments to a borrower that was already indebted to the Bank for over $1,000,000 and whose financials revealed that he could not reasonably service the debt or pay the loan off at maturity.

84.     The JH loan was charged off in December 2009 after the borrower sold the collateral, because the sale proceeds were insufficient to pay the Bank's second mortgage.  The tortious conduct of Barone, Chakeris, and Hines in connection with the approval of this transaction has resulted in damages of at least $194,109.

## INMAN PARK PROPERTIES, INC.

85.     Pursuant to Barone's recommendation and the approval of Case, Hines and Owenby, on December 18, 2008, a $250,000 line of credit was extended to Inman Park Properties, Inc. ("Inman"), another entity owned by JN ("Inman loan").  The stated purpose of the loan was to permit JN to pay taxes and other expenses associated with unspecified rental properties.  The terms of repayment were twelve months interest only with full principal reduction before the anniversary date.  No new collateral secured repayment of the loan, which was simply cross-collateralized with the Whitaker and Gaston loans.

86.     Barone, Case, Hines and Owenby ("Inman Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the Inman loan as evidenced by, among other things, the Defendants' failure to undertake or require an adequate pre-approval analysis, violations of the Loan Policy, and failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines.  For example:

a.  Since the Inman Defendants advanced additional funds without taking new collateral, they knew the loan's source of repayment was inadequate.  As set forth above, the cash flows from Whitaker and Gaston were insufficient to cover repayment of their respective obligations, much less any additional obligations.

b.  The Inman Defendants knew the pre-funding analysis of the loan was inadequate. Although the Gaston loan, extended six weeks earlier, had been conditioned on JN's providing updated financial statements, no updated financial information was obtained prior to approval of the Inman loan.

c.  As with the earlier Whitaker and Gaston loans, the Inman loan was approved without any global cash flow analysis of JN's ability to repay his debts and no calculation of his DTI ratio.  Had the Inman Defendants sought such an analysis, they would have learned that, while the Inman loan increased JN's total debt to the Bank to approximately $4.25 million, his financial information reflected that he had liquid assets of only $3.8 million against direct and contingent liabilities of approximately $195 million.  They also would have discovered that JN's rental properties produced losses of $3.3 million in 2006 and $3.7 million in 2007.

d.  The Loan Request simply copied portions of the Gaston Loan Request without making any adjustments in the DSC ratio calculation, i.e., the DSC calculation failed to include the new debt.  In total, the Whitaker, Gaston and Inman loans had combined debt service requirements of approximately $28,375 per month.  As set forth above, the Whitaker property produced a net operating loss in 2007 and the Gaston property produced only $29,070 in net income.  Adding the Inman loan to the debt serviced by those properties further reduced the DSC ratio which was already below the level required by the Loan Policy.

e.  The Inman Defendants knew the interest-only terms of the loan were inappropriate and did not comport with prudent lending standards.  The loan proceeds were used to pay taxes and other expenses of income producing properties that did not produce sufficient income to repay the total principal due at maturity on all loans secured by the assignment of rents.

f.  The Inman Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  There was no financial information or analysis to demonstrate the borrower's ability to repay the loan at maturity.

87.    The borrower was assessed late charges almost immediately after the loan closed. The assessment of late charges became systematic throughout the life of the loan.  The loan was renewed at least once.  The borrower made no payments on the outstanding balance after May 31, 2011.  The tortious conduct of Barone, Case, Hines, and Owenby in connection with the recommendation and approval of this transaction has resulted in damages of at least $245,136.

**DS**

88.     Pursuant to Barone's recommendation and the approval of Case, Cole, Hines, and Owenby, on February 4, 2009, a $685,000 loan was extended to DS ("DS loan").  The purpose of the loan was to purchase a lot located on Kiawah Island, South Carolina for $685,000.  The terms of the loan were three years of interest only payments.  The loan was secured by a first mortgage on the property to be purchased and a second mortgage on the borrower's personal residence.

89.     Barone, Case, Cole, Hines, and Owenby ("DS Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the loan to DS as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, approval of improper loan terms, and violations of the Loan Policy.  For example:

a.  The DS Defendants knew that there was no adequate source of repayment for this loan.  The only source of repayment identified in the Loan Request was the personal cash flow of DS, who was also obligated to repay a previous $2.2 million loan obtained from the Bank.  Not including the proposed loan, the Loan Request reported DS's annual debt service requirements as $425,820.  Not including the proposed debt, the cash flow worksheet reflected that DS had negative cash flow during 2006 and 2007, resulting in DSC ratios of 0.58 and 0.49, respectively, well below the Loan Policy requirement of 1.2.  According to the Loan Request, DS's DTI ratio was 204.19% following the extension of the earlier $2.2 million loan.  Although the Loan Request reflects that DS's anticipated income for 2008 would be $2 million, no documentation was offered to justify that ten-fold increase.  In fact, the Loan Request references the cash flow worksheet which specifically states that the $2 million is from an anticipated sale of a property at some time in the future.

b.  The DS Defendants knew the three-year interest-only terms of the loan were inappropriate and did not comport with prudent lending standards or Loan Policy requirements.  The loan was simply for the purchase of a vacant lot.  The proceeds were not going to be used for renovation or construction.

c.  The DS Defendants approved 100% financing of DS's purchase price of the lot in a declining real estate market, rendering the ability to recoup the debt from the sale of the collateral doubtful.

    d.  The Defendants knew the DS loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  The financial information provided reflected the borrower's inability to service his debts.  The loan violated the DTI and DSC ratio requirements set forth in the Loan Policy.  The loan made inappropriate use of interest only terms and violated the amortization requirements of the Loan Policy.

90.    Late charges were incurred by the borrower beginning in February 2010 and numerous payments were missed starting in August 2010.  The borrower made no payments on the outstanding balance after December 2010.  The tortious conduct of Barone, Case, Cole, Hines, and Owenby in connection with the approval of the DS transaction has resulted in damages of at least $207,355.

## PORTSIDE CENTER, LLC

91.    Pursuant to Barone's recommendation and the approval of Case and Hines, on February 6, 2009, a $250,000 line of credit was extended to Portside Center, LLC ("Portside"), a limited liability company owned by JM and RR ("Portside loan").  The purpose of the loan was to pay interest on an earlier $2.6 million loan extended to Portside for construction of a commercial office building.  The terms of repayment were twelve months interest only with full principal reduction at the anniversary date.  The loan was secured by second mortgages on the personal residences of JM and RR.

92.    Barone, Case and Hines ("Portside Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the Portside loan as evidenced by, among other things, the Portside Defendants' failure to undertake or require an adequate pre-approval analysis, violations of the Loan Policy, and failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines.

For example:

a. Since the purpose of the line of credit was to enable the borrower to service existing debt, the Portside Defendants knew the borrower was unable to service its existing debt.

b. The Portside Defendants knew the loan had no adequate source of repayment. The primary source of repayment was sale of commercial office condos – the same source of repayment that was insufficient to service the debt on the development loan. As of the date of loan approval, the only sale had occurred in April 2007. The real estate market was in decline, there had been no condo sales in the twenty months prior to approval of the Portside loan, and the Portside Defendants made no analysis of the anticipated absorption rate for the sale of the remaining condo units.

c. The collateral – second mortgages on the guarantors' personal residences – represented a second position behind $2.2 million in debt to the first mortgage holders. In addition, the Portside Defendants simply relied on the valuations provided by the guarantors without obtaining any independent appraisals of the real estate collateral in violation of the Loan Policy and Regulatory Guidelines.

d. The Portside Defendants knew the pre-approval analysis was inadequate. The credit reports on the two guarantors were dated in April and May, 2007, respectively, and were outdated at the time of approval of the Portside loan. In addition, the Loan Request reflected that JN had liquid assets of only $22,500. RR, described as the stronger of the two guarantors, had liquid assets of only $850,605 against liabilities of $5.4 million. The financial information obtained failed to demonstrate the ability of the guarantors to repay the debt.

e. The Portside Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited. The Portside loan made inappropriate use of interest-only terms to permit the borrower to pay interest on another loan. In addition, there was no financial information or analysis to demonstrate the borrower's or guarantor's ability to repay the loan at maturity.

93.     Not surprisingly, the borrower was unable to sell the commercial office condos and was unable to repay the loan. The tortious conduct of Barone, Case, and Hines in connection with the approval of the DS transaction has resulted in damages of at least $234,418.

**CH**

94.     Pursuant to Barone's recommendation and the approval of Case, Chakeris, and Hines, on March 4, 2009, a $560,000 loan was extended to CH ("CH loan"). The purpose of the

loan was listed in the Loan Request as simply "personal purposes." The terms of the loan were 12 months of interest-only payments with a balloon payment at maturity. The loan was secured by a first mortgage on a duplex located in Folly Beach, South Carolina. The property was actually owned by P & J Holdings, LLC, an entity that was neither a guarantor nor a borrower on this loan.

95.    Barone, Case, Chakeris, and Hines ("CH Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the loan to CH as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy and Regulatory Guidelines, approval of improper loan terms, and violations of the Loan Policy. For example:

a.    The Loan Request reflected that the property securing the loan was not appraised at the time of approval. Instead, the CH Loan Defendants approved the loan based on an "estimated" value of $800,000 in contravention of the Loan Policy and the Regulatory Guidelines.

b.    The loan had no stated purpose. The Loan Request merely stated that the loan was for "personal purposes."

c.    The CH Defendants knew the loan had no clearly defined source of repayment and lacked information to determine whether there was any adequate source of repayment. The Loan Request stated, "The primary source of repayment will be the new loan secured by a house on Folly Beach …." There was no discussion of any future loan and the Loan Request did not describe how the collateral would fund repayment. There was no discussion of any rental income or any plans to market and sell the home.

d.    The secondary source of repayment was the cash flow of CH. Although the loan was made in March of 2009, the Loan Request does not report on CH's current financial condition, but relied instead on outdated financial information from 2007 and earlier. Had the CH Defendants inquired, they would have discovered that CH's financial condition had deteriorated significantly since the 2006 and 2007 information provided by CH. CH's 2008 tax return reflected gross income of only $56,613. A personal financial statement dated May 28, 2009, just months after the CH loan was advanced, reflected total assets of $1.3 million, total liabilities of $11.1 million, and a negative

net worth of $9.8 million.  The CH Defendants knew that CH was involved in numerous closely-held entities with extensive debt mostly secured by real property. Accordingly, the CH Defendants should have required a global cash flow analysis and current financial information prior to funding the CH loan.

e.  The CH Defendants knew the interest only terms of the CH loan were inappropriate and did not comport with prudent lending standards or Loan Policy.

f.  The CH Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.   The loan lacked a defined repayment program and financial information that demonstrated the borrower's ability to repay the loan.  The CH Defendants relied on stale financial information and failed to require a global cash flow analysis.  The loan also made inappropriate use of interest only terms.

96.    Late charges were incurred beginning in October 2009.  No "new loan" ever closed to take this loan out.  The loan was renewed in April 2010 and the borrower made no payments on the outstanding balance after April 30, 2010.  The tortious conduct of Barone, Case, Chakeris, and Hines in connection with the approval of the CH transaction has resulted in damages of at least $222,012.

**Khalidi Properties, LLC**

97.    In January 2009, pursuant to Barone's recommendation, Case and Hines approved a $1,120,000 loan to Khalidi Properties, LLC ("Khalidi"), a limited liability company owned by RK and PK ("Khalidi loan").  As proposed, the purpose of the loan was (a) to refinance existing Class C commercial/warehouse space consisting of four separate structures totaling 29,000 square feet, and (b) to provide funds to construct a 6,000 square foot addition.  The terms of repayment were six months interest only during the construction phase, followed by 59 payments of principal and interest based on a 20-year amortization and one final balloon payment of approximately $950,000.  The loan was secured by the subject property.

98.    Barone, Case and Hines ("Khalidi Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and approving the Khalidi loan as

evidenced by, among other things, the Defendants' failure to undertake or require an adequate

pre-approval analysis, violations of the Loan Policy, and failure to comply with prudent

underwriting standards as set forth in the Loan Policy and Regulatory Guidelines.  For example:

    a.  The Khalidi Defendants knew the loan's source of repayment was inadequate.  The primary source of repayment was the rental income to be generated by the property.  At the time of approval, the Loan Request stated that the property generated annual rental income in the gross amount of $109,380.  The Loan Request made no analysis of the expenses that would offset the gross rental income.  The annual principal and interest payments required to service the debt were $104,200.  Even allowing no discount for operating expenses, the Loan Request used gross rental income to calculate a DSC ratio of 1.05, which was still well below the 1.20 DSC ratio required by the Loan Policy.

    b.  The Khalidi Defendants knew the pre-approval analysis of the loan was inadequate.  Khalidi's largest tenant was Southern Pine Company, LLC, an entity owned by RK and PK.  The loan file does not contain copies of the leases to any tenant other than Southern Pine, nor does it contain any financial information to support the tenants' ability to satisfy their lease obligations as required by Loan Policy.  The Loan Request states that RK and PK had liquid assets of only $75,300.  Although the Loan Request reflects that PK and RK have interests in numerous real estate properties, it contained no global cash flow analysis of RK, PK, Khalidi and their related businesses that would support their ability to repay the debt.

    c.  The Khalidi Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  There was no financial information or analysis to demonstrate the borrower's or guarantors' ability to repay the loan at maturity.

    99.  Following approval of the $1.12 million loan, but before disbursement, Khalidi

notified the Bank that it no longer desired to construct the 6,000 square foot addition.  Without

taking the loan back to the BLC for reconsideration, Barone approved disbursement of $920,000

to Khalidi on the same terms as originally approved, which included six months of interest only

payments, followed by 59 payments of principal and interest based on a 20-year amortization

and one final balloon payment of approximately $800,000.  As funded, the loan suffered from

the same deficiencies, including no viable source of repayment, inappropriate use of interest only

and 20-year amortization periods with a large balloon payment at maturity, no defined repayment

plan, lack of financial information documenting the tenants' ability to satisfy their obligations, and no financial documentation or analysis demonstrating the borrower's or guarantors' ability to repay the loan at maturity. In addition, the approval of the $1.12 million was conditioned on the property being fully leased before funding, a condition that had not been met at the time Barone approved the disbursement of $920,000.

100. The last payment on the Khalidi loan was made from an Atlantic business account in October 2010. The following month, late charges were assessed against Khalidi and were thereafter repeatedly incurred for the reminder of the life of the loan. The tortious conduct of Barone, Case, and Hines in connection with the approval of the Khalidi transaction has resulted in damages of at least $261,875.

**HP**

101. Pursuant to Barone's recommendation and the approval of Case, Chakeris, Cole, Hines, and Owneby, on April 15, 2009 a $100,000 loan was extended to HP (owner/guarantor of Pavilack) ("HP loan"). The purpose of the loan was to provide short term working capital for the purchase of foreclosed or soon to be foreclosed properties. The terms of the loan were interest only for 12 months, renewable annually, with principal and interest due on demand. This loan was unsecured.

102. Barone, Case, Chakeris, Cole, Hines, and Owenby ("HP Defendants") were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the loan to HP as evidenced by, among other things, their failure to undertake or require an adequate pre-approval analysis, failure to comply with prudent underwriting standards as set forth in the Loan Policy, approval of inappropriate loan terms, and violations of the Loan Policy. For example:

a.  The HP Defendants knew the repayment terms did not comport with prudent lending standards, as the loan required interest-only payments for 12 months and was renewable annually.

b.  The HP Defendants knew that the failure to secure the loan was inconsistent with prudent lending standards.  HP was a guarantor on at least $3,000,000 in loans to Pavilack that involved the ownership of at least 20 different properties.

c.  The Loan Request lacked financial information necessary for underwriting the loan and from the information available, the HP Defendants knew or should have known the loan failed to comply with prudent underwriting standards.  The primary source of repayment was the personal cash flow of HP.  The HP Defendants knew that HP was involved in a significant amount of other closely-held businesses, yet there was no global cash flow analysis of his ability to service the debt or to pay off the principal of the loan at maturity.  The Loan Request explicitly relies upon HP's 2007 tax return and an internal credit analysis of HP that was performed in 2007.  Had the HP Defendants demanded updated financial information, they would have learned that HP had an adjusted gross income of negative $434,241 in 2008, that his DSC ratio in 2008 was 0.85, and that his DTI ratio in 2008 was 99%.

d.  The HP Defendants knew the loan was an undesirable loan pursuant to the Loan Policy and thus was prohibited.  The loan was unsecured, made inappropriate use of interest-only terms, and the financial information provided was insufficient to determine the borrower's ability to repay the loan.

103.    Late charges were incurred by HP beginning in November 2009.  HP could not even make the interest-only payments and defaulted on the loan in February 2010.  The loan was charged-off in May 2010.  The tortious conduct of Barone, Case, Chakeris, Cole, Hines, and Owenby in connection with the approval of the HP transaction has resulted in damages of at least $101,158.

## VI. CLAIMS FOR RELIEF

104.    FDIC-R pleads each of the following Counts in the alternative.

## COUNT I – GROSS NEGLIGENCE

## AGAINST ALL DEFENDANTS

105.    The allegations of Paragraphs 1 through 103 of this Complaint are incorporated herein by reference.

106.     As directors and/or officers of Atlantic, the Defendants owed a duty of care to discharge their duties in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances. This duty of care included, but was not limited to, the following:

    a.   To ensure that loans approved by them were underwritten and approved in accordance with the law, regulations, and Loan Policy applicable thereto and in accordance with prudent banking practices;

    b.   To make all decisions, including those relating to the approval of loans, on the basis of a rational process availing themselves of all material and reasonably available information;

    c.   To faithfully and diligently perform their duties as officers and/or directors of Atlantic.

107.     In disregard of their duties, the Defendants failed to exercise that degree of diligence, care, judgment, skill and good faith which an ordinarily prudent person would have exercised under similar circumstances in like positions with respect to the approval of the loans identified herein.  The Defendants' failures to exercise reasonable care, skill, diligence, competence and good faith in the discharge of their responsibilities include, but are not limited to:

    a.   Failing to exercise independent judgment in recommending and approving loans;

    b.   Failing to make decisions relating to the approval of loans on the basis of a rational process and failing to avail themselves of all material and reasonably available information;

    c.   Permitting and/or performing wholly inadequate or inaccurate analysis of borrower repayment capabilities (e.g., a lack of cash flow analyses, inaccurate computations of cash flow and debt service coverage ratios) in connection with the approval of loans;

    d.   Relying on collateral (such as the sale of real estate) as a primary source of repayment;

    e.   Recommending or approving loans with grossly inadequate documentation or verification of financial condition, repayment capability, and collateral values;

f.   Failing to obtain required appraisals and/or relying on inaccurate, facially flawed, inappropriate and/or incomplete real estate appraisals despite red flags showing these deficiencies;

g.   Approving unsecured and/or under secured loans contrary to prudent banking practice; and

h.   Approving loans in violation of the Loan Policy and Regulatory Guidelines with insufficient or nonexistent mitigating factors to justify those violations.

108.    The acts and omissions of the Defendants were absent of that degree of care that was necessary under the circumstances, thus constituting gross negligence on the part of the Defendants.

109.    As a direct and proximate result of the foregoing and other breaches, acts and omissions of the Defendants, the FDIC-R has suffered damages of $9.263 million or such other amount to be proven at trial.

110.    Pursuant to 12 U.S.C.A. § 1821(k), S.C. Code Ann. § 33-8-300 and S.C. Code Ann. § 33-8-420, the FDIC-R is entitled to recover from the Defendants all damages sustained as a result of their gross negligence alleged herein.

## COUNT II – NEGLIGENCE

## AGAINST ALL DEFENDANTS

111.    The allegations of Paragraphs 1 through 103 of this Complaint are incorporated herein by reference.

112.    As directors and/or officers of Atlantic, the Defendants owed a duty of care to discharge their duties in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances. This duty of care included, but was not limited to, the duties set forth in Paragraph 106 (a)-(c) above.

113.     In disregard of their duties, the Defendants failed to exercise that degree of diligence, care, judgment, skill and good faith which an ordinarily prudent person would have exercised under similar circumstances in like positions in approving the loans identified herein. The Defendants' failures to exercise reasonable care, skill, diligence, competence, and good faith in the discharge of their responsibilities include, but are not limited to, the failures and breaches of duty set forth in Paragraph 107 (a)-(h) above.

114.     As a direct and proximate result of the foregoing acts of negligence and other breaches, acts, and omissions of the Defendants, FDIC-R has suffered damages of $9.263 million or such other amount to be proven at trial.

115.     Pursuant to 12 U.S.C.A. § 1821(k), S.C. Code Ann. § 33-8-300 and S.C. Code Ann. § 33-8-420, the FDIC-R is entitled to recover from the Defendants all damages sustained as a result of their negligence alleged herein.

## COUNT III - BREACH OF FIDUCIARY DUTIES

### AGAINST ALL DEFENDANTS

116.     The allegations of Paragraphs 1 through 103 of this Complaint are incorporated herein by reference.

117.     Pursuant to applicable federal statutes, regulations and South Carolina law, directors and officers of insured financial institutions, such as Atlantic, stand in a fiduciary relationship and are obligated to discharge the duties of their respective positions in accordance with the standards imposed by applicable laws.

118.     The Defendants owed fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence, and fair dealing in the management, conduct, and direction in the course of their duties as directors and officers.  The Defendants duties included,

but were not limited to, those set forth in Paragraph 106 (a)-(c) of this Complaint.

119.    The Defendants, individually and collectively, breached their fiduciary duties by failing to exercise that degree of diligence, care, loyalty, judgment, and skill required of them in approving the loans identified herein

120.    The Defendants committed or permitted acts and omissions which resulted in great damage, including, but not limited to, those acts and omissions listed in Paragraph 107 (a)-(h) of this Complaint.

121.    As a direct and proximate result of the breaches of fiduciary duty by the Defendants, FDIC-R has sustained damages of $9.263 million or such other amount to be proven at trial.

122.    Pursuant to provisions of applicable law, the FDIC-R is entitled to recover from the Defendants all damages sustained as a result of the breaches of fiduciary duty alleged herein.

WHEREFORE, THE FDIC-R PRAYS for judgments against the Defendants as follows:

1.    For compensatory, consequential, and other damages, jointly and severally, against Defendants for their negligence, gross negligence, and/or breaches of fiduciary duty that resulted in damages in an amount to be proven at trial.

2.    For prejudgment, post-judgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l) and South Carolina law against all Defendants on amounts for which they are liable.

3.    For the FDIC-R's recoverable costs and expenses incurred in connection with this matter.

4.    For any other relief as the Court may deem just, equitable or proper.

5.    Plaintiff demands a trial by jury on all issues.

Dated: May 30, 2014                Respectfully submitted,


<u>/s/ R. Bruce Wallace</u>
R. Bruce Wallace
NEXSEN PRUET
205 King Street, Suite 400
Charleston, SC  29401
(843) 577-9440
(843) 414-8222 (fax)
bwallace@nexsenpruet.com
Wallace Fed. ID No. 7018

Mary L. Wolff
(Motion for Admission *Pro Hac Vice* Pending)
 WOLFF ARDIS, P.C.
5810 Shelby Oaks Drive
Memphis, TN 38134
(901)763-3336
(901)763-3376 (fax)
mwolff@wolffardis.com
Wolff TN Bar No. 8262


*Attorneys for Plaintiff*